1  Darren Remington
   533 Church St, #136
2  Nashville, TN 37219

3

4              UNITED STATES DISTRICT COURT

5              FOR THE DISTRICT OF ARIZONA

6  BRIAN KOLFAGE and ASHLEY KOLFAGE,        No. 2:14-cv-01638-HRH
7  husband and wife,

8                    Plaintiffs,

9  v.                                        **DEFENDANT DARREN
                                             REMINGTON'S ANSWER
10 LOUIS ANTHONY CAPONECCHIA, also          AND AFFIRMATIVE DEFENSES**
11 known as FRANK DARBO, FAWN
   LEBOWITZ, JIM REEVES, and ESTER
12 CUMBSKI; DARREN REMINGTON also
   known as REN REM and REGINALD
13 REMINGTON; JUSTINE L. GRANT;
   NATHANIEL S. DOWNES, also known as
14 SPOCK ELVIS, OLIVE COSSACK, and ERIC
15 STRATTON; PAUL E. LOEBE; JOHN L.
   PRAGER; KENNETH V. VANDERZANDER
16 also known as KENNY VANDERZANDEN,
17 HOWARD FINCH, PATCHES O'HOULIHAN,
   LAFFIN DEMON, LEFT HANDED
18 ARCHITECT,

19                   Defendants.

20

21

22      In answer to the allegations of the complaint of Brian G. Kolfage, Jr., and Ashley

23 Kolfage ("plaintiffs"), defendant Darren Remington ("Remington"), representing himself *pro*

24 *se*, states that, contrary to plaintiff's allegations, by their lawsuit, plaintiffs seek to improperly

25 quash legitimate public criticism and commentary of public figures simply because such

26 reflects negatively upon their public reputation.

                              1

1    As Remington is presenting his Answer on a *pro se* basis, and is not a lawyer, he asks
2  for the Court's indulgence and latitude for any violations of the Court's Rules of Procedure,
3  specifically regarding the format, manner of presentation and any minor transgressions or
4  omissions of *pro forma* matter regarding this Answer.

5    Remington is a Military Veteran with just over 10 years of military service. He
6  originally enlisted in the U.S. Army on his 17th birthday in 1983, the earliest date possible for
7  him to enlist. Remington transferred to the U.S. Air Force (USAF) effective August 23, 1985.

8    He was promoted to the rank of Staff Sergeant in the USAF in May, 1990. This rank is
9  superior to the highest rank attained by Kolfage and is awarded based on meritorious service
10  and not simply "Time-In-Grade/Time-In-Service" as was the highest rank attained by Kolfage.

11    During his service with the USAF, Remington was trained and qualified in two
12  occupational specialties, also known as Air Force Specialty Codes (AFSC). For both of those
13  specialties, he was selected as "Honor Graduate" at the Technical Training Schools. Being
14  selected as "Honor Graduate" for one AFSC is rare. Being selected twice for two different
15  specialties is almost unheard of.

16    Remington held the highest security clearance (Top Secret) with special designator
17  SIOP/ESI. This clearance was required for the performance of his duties with the Joint
18  Strategic Target Planning Staff (JSTPS) and gave him access to the United States' most
19  closely guarded nuclear secrets.

20    Remington separated from active duty with an honorable discharge on April 1, 1993.

21    Since departing active duty, Remington has pursued a vocational career as an
22  information technology (IT) professional, continuing to use his experience and expertise with
23  computer systems gained as a Communications/Computer Systems Programming Specialist
24  for the USAF. He has worked in all areas of software development including, but not limited
25  to, Computer Security and Information Security.

26

1    Remington has had a lifelong interest in political history in the United States. As a

2    registered Republican, he describes himself as an "Eisenhower Conservative". Remington is a

3    lifelong Christian with a longtime interest in the history of the Bible.

4    Plaintiffs' Complaint is a naked attempt to quash legitimate, albeit negative, criticism

5    regarding the plaintiffs in order to "scrub the record" and give the plaintiff a "clean slate". It is

6    clearly intended to boost the plaintiff's apparent political aspirations for elected office; give a

7    platform to advertise the conveniently-timed re-launch of his blog; and increase t-shirt sales.

8    It is also clear that plaintiffs intended to try this case in the media before bringing it

9    before the Court. The media was alerted to the suit, by attorney Elia, before being filed on

10    June 13. A copy of the complaint was provided to the media even before the first defendant

11    had been properly served. In at least one public interview, attorney Elia gave evidence

12    indicating that he had not performed due diligence before filing the Complaint with this Court.

13    In reviewing this baseless civil complaint for any merit, it strikes Remington as badly

14    organized with a "Prayer for Relief" section for each of the "Counts". It also occurs to him that

15    this meritless complaint is structured like a criminal indictment instead of a civil complaint.

16    The few civil complaints that Remington is familiar with all contain a single "Prayer for

17    Relief" even when preceded by several "Causes of Action".

18    Attorney Elia should know that the bar for defamation is higher for, and false light tort

19    doesn't apply to, public figures, such as the plaintiffs.

20    As it is, this nuisance complaint is a complete waste of the Court's time. Attorneys Elia

21    and Ingle are apparently "gaming the system" and using the Court in some sort of publicity

22    stunt. If attorneys Elia and Ingle had performed their due diligence, they would have found

23    that this case has no merit as the plaintiffs are guilty of having Unclean Hands as pertains to

24    the Causes of Action in the Complaint. If attorneys Elia and Ingle had performed their due

25    diligence in evaluating the merits of the Complaint, they would have noted that this Court

26    lacks Personal Jurisdiction over Remington. For this reason, "Malicious Prosecution",

1    "Specious Prosecution", and "Abuse of Process" are three Affirmative Defenses present in this

2    Answer, in addition to "Unclean Hands", "Public Figure" and "Lack of Personal Jurisdiction".

3         This complaint is clearly being used by Elia to extend the harassment of Remington

4    with regards to the Process of Service. Attorney Elia did send the Summons for this Complaint

5    to a former address in Florida where Remington has not resided in over seven years, knowing

6    full well his current address is in Tennessee, as registered with the U.S. Postal Service.

7    Attorney Elia also sent the Summons for this Complaint by process server to the address of an

8    elderly woman in FL – an address that Remington has never resided at nor knowingly received

9    mail at. This is clearly a blatant act of harassment and intimidation of Remington's extended

10   family. Attorney Elia has also used process of service for this complaint to interfere with

11   Remington's relationship with his current employer, whose headquarters is in Atlanta, GA – a

12   city where Remington has never lived nor received mail at. As Elia should have known

13   Remington's current address is in Tennessee, as registered with the U.S. Postal Service, this is

14   clearly an instance of Tortious Interference with a Business Relationship on the part of Elia.

15        If attorneys Elia and Ingle are confused by Remington's reference to "Unclean Hands",

16   they may wish to review the criminal complaint for harassment, #14-0598213, which

17   Remington filed on June 23, 2014, with the local police in TN, naming the plaintiffs as two of

18   three principle suspects. The criminal complaint outlines how Susanne Gann's (Gann)

19   Facebook account was "hacked" (a federal crime, as well as a crime in the states of TN and

20   AZ) and the illegal access led to the disclosure of Remington's full, legal name which was not

21   accessible or available from Remington's pseudonymous Facebook account. The illegal access

22   also led to the disclosure of Gann's full, legal name which was not otherwise accessible or

23   available to the public through her pseudonymous Facebook account. The plaintiffs have not

24   disclosed with any plausible explanation how they made the connection between Remington's

25   legal identity and his pseudonymous Facebook page.

26

4

1       While Remington has pseudonymously made public comments regarding many aspects

2   of plaintiff's business ventures, Remington has not engaged in any wrongdoing. Contrary to

3   plaintiff's unsupported assertions, Remington has not defamed plaintiffs; he has not

4   intentionally inflicted emotional distress; he has not wrongfully or dishonestly portrayed

5   plaintiffs in a false light; and he has not interfered with plaintiff's contracts. Perhaps most

6   significant to the purpose of this Answer to the Complaint, none of Remington's actions or

7   comments about the Plaintiffs rise to the level of establishing Personal Jurisdiction over

8   Remington by this Court. Remington maintains no contacts, business or personal, with anyone

9   in the State of Arizona. Remington owns no property within the State of Arizona, real or

10  otherwise. Remington has never visited the State of Arizona, even while in transit to locations

11  outside the State of Arizona.

12      With this preamble, Remington specifically avers as follows, based upon personal

13  knowledge as to his own actions and intent and upon information and belief as to the actions

14  and intent of others:

15                          **PARTIES AND JURISDICTION**

16  1-4.   States that he is without information sufficient to form a belief as to the veracity of the

17         averments of paragraphs 1 through 4.

18  5.     Admits the averments of paragraph 5.

19  6.     Denies the averments of paragraph 6.

20  7-13.  States that he is without information sufficient to form a belief as to the veracity of the

21         averments of paragraphs 7 through 13.

22

23  **GENERAL ALLEGATIONS REGARDING BRIAN AND ASHLEY KOLFAGE**

24  14-18. States that he is without information sufficient to form a belief as to the veracity of the

25         averments of paragraphs 14 through 18.

26  19.    Denies the averments of paragraph 19.

20.     States that he is without information sufficient to form a belief as to the veracity of the averments of paragraph 20.

21.     Denies the averments of paragraph 21.

22.     States that he is without information sufficient to form a belief as to the veracity of the averments of paragraph 22.

23.     Denies the averments of paragraph 23.

24-25. States that he is without information sufficient to form a belief as to the veracity of the averments of paragraphs 24 through 25.

26.     Denies the averments of paragraph 26.

27.     States that he is without information sufficient to form a belief as to the veracity of the averments of paragraph 27, except denies the "principals" averment and notes the word "principals" is misused.

28.     Denies the averments of paragraph 28.

29-32. Admits the averments of paragraphs 29 through 32.

## GENERAL ALLEGATIONS REGARDING CAPONECCHIA

33.     Repeats and realleges his answers to the averments contained in paragraphs 1 through 32 as if fully set forth herein.

34-47. States that he is without information sufficient to form a belief as to the veracity of the averments of paragraphs 34 through 47.

48.     States that he is without information sufficient to form a belief as to the veracity of the second averment of paragraph 48 and denies the first averment of paragraph 48.

49-50. States that he is without information sufficient to form a belief as to the veracity of the averments of paragraphs 49 through 50.

51.     States that he is without information sufficient to form a belief as to the veracity of the first and third averments of paragraph 51 and denies the second averment in paragraph

1    51 and notes the word "homosexual" is misspelled.

2  52-64. States that he is without information sufficient to form a belief as to the veracity of the
3    averments of paragraphs 52 through 64.

4  65.    States that he is without information sufficient to form a belief as to the veracity of the
5    averments of paragraph 65 except notes that the false light tort does not apply to public
6    figures such as the plaintiffs.

7  66.    States that he is without information sufficient to form a belief as to the veracity of the
8    averments of paragraph 66.

9  67-68. States that he is without information sufficient to form a belief as to the veracity of the
10    averments of paragraphs 67 through 68 except notes that defendant's name is
11    misspelled.

12  69.    States that he is without information sufficient to form a belief as to the veracity of the
13    first, second, and fourth averments of paragraph 69 and denies the third averment of
14    paragraph 69.

15  70-82. States that he is without information sufficient to form a belief as to the veracity of the
16    averments of paragraphs 70 through 82.

17

18    **GENERAL ALLEGATIONS REGARDING REMINGTON**

19  83.    Repeats and realleges his answers to the averments contained in paragraphs 1 through
20    82 as if fully set forth herein.

21  84-95. Denies the averments of paragraphs 84 through 95.

22  96.    Admits the first averment of paragraph 96 and denies the second averment of paragraph
23    96.

24  97.    Denies the averments of paragraph 97.

25  98.    Admits the first averment of paragraph 98 and denies the second averment of paragraph
26    98.

99-104. Denies the averments of paragraphs 99 through 104.

### GENERAL ALLEGATIONS REGARDING GRANT

105. Repeats and realleges his answers to the averments contained in paragraphs 1 through 104 as if fully set forth herein.

106-111. States that he is without information sufficient to form a belief as to the veracity of the averments of paragraphs 106-111.

112. Denies the averments of paragraph 112.

113-116. States that he is without information sufficient to form a belief as to the veracity of the averments of paragraph 113 through 116.

### GENERAL ALLEGATIONS REGARDING DOWNES

117. Repeats and realleges his answers to the averments contained in paragraphs 1 through 116 as if fully set forth herein.

118-122. States that he is without information sufficient to form a belief as to the veracity of the averments of paragraphs 118 through 122.

123-124. States that he is without information sufficient to form a belief as to the veracity of the averments of paragraphs 123 through 124 except notes that defendant's name is misspelled.

125-127. States that he is without information sufficient to form a belief as to the veracity of the averments of paragraphs 125 through 127.

128. Denies the averments of paragraph 128.

129. States that he is without information sufficient to form a belief as to the veracity of the averments of paragraph 129.

130. The averments in paragraph 130 are vague, non-specific and cannot be answered.

1   131-134. States that he is without information sufficient to form a belief as to the veracity of

2   the averments of paragraphs 131 through 134.

3

4   **GENERAL ALLEGATIONS REGARDING LOEBE**

5   135.   Repeats and realleges his answers to the averments contained in paragraphs 1 through

6   134 as if fully set forth herein.

7   136-138. States that he is without information sufficient to form a belief as to the veracity of

8   the averments of paragraphs 136 through 138.

9   139.   The averments in paragraph 139 are vague, non-specific and cannot be answered.

10  140-142. States that he is without information sufficient to form a belief as to the veracity of

11  the averments of paragraph 140 through 142.

12  143.   Admits the averments of paragraph 143 except notes that "dox" is misspelled.

13  144.   Denies the averments of paragraph 144.

14  145.   Denies the averments of paragraph 145 and notes that "dox" is misspelled.

15  146-149. States that he is without information sufficient to form a belief as to the veracity of

16  the averments of paragraphs 146 through 149.

17

18  **GENERAL ALLEGATIONS REGARDING PRAGER**

19  150.   Repeats and realleges his answers to the averments contained in paragraphs 1 through

20  149 as if fully set forth herein.

21  151-164. States that he is without information sufficient to form a belief as to the veracity of

22  the averments of paragraphs 151 through 164.

23

24  **GENERAL ALLEGATIONS REGARDING VANDERZANDEN**

25  165.   Repeats and realleges his answers to the averments contained in paragraphs 1 through

26  164 as if fully set forth herein.

166-179. States that he is without information sufficient to form a belief as to the veracity of the averments of paragraphs 166 through 179.

## COUNT 1 – DEFAMATION
### (AGAINST ALL DEFENDANTS)

180.   Repeats and realleges his answers to the averments contained in paragraphs 1 through 179 as if fully set forth herein.

181-195. Denies the averments of paragraphs 181 through 195 as pertains to Remington. States that he is without information sufficient to form a belief as to the veracity of the averments of paragraphs 181 through 195 as pertains to other defendants.

States that the enumerated paragraphs A – G, following paragraph 195, contain a request for relief as to which no response is required. To the extent a response is required, Remington denies plaintiffs are entitled to the requested relief or to any relief.

## COUNT 2 – DECLARATORY RELIEF
### (AGAINST ALL DEFENDANTS)

196.   Repeats and realleges his answers to the averments contained in paragraphs 1 through 195 as if fully set forth herein.

197-199. States that he is without information sufficient to form a belief as to the veracity of the averments of paragraphs 197 through 199.

200.   This is a legal contention to be presented to the court and is otherwise denied.

201.   Denies the averments of paragraph 201 as pertains to Remington. States that he is without information sufficient to form a belief as to the veracity of the averments of paragraph 201 as pertains to other defendants.

States that the enumerated paragraphs A – D, following paragraph 201, contain a request for relief as to which no response is required. To the extent a response is required, Remington denies plaintiffs are entitled to the requested relief or to any relief.

## COUNT 3 – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (AGAINST ALL DEFENDANTS)

202.  Repeats and realleges his answers to the averments contained in paragraphs 1 through 201 as if fully set forth herein.

203-206. Denies the averments of paragraphs 203 through 206 as pertains to Remington. States that he is without information sufficient to form a belief as to the veracity of the averments of paragraphs 203 through 206 as pertains to other defendants.

States that the enumerated paragraphs A – F, following paragraph 206, contain a request for relief as to which no response is required. To the extent a response is required, Remington denies plaintiffs are entitled to the requested relief or to any relief.

## COUNT 4 – FALSE LIGHT
## (AGAINST ALL DEFENDANTS)

207.  Repeats and realleges his answers to the averments contained in paragraphs 1 through 206 as if fully set forth herein.

208-211. Denies the averments of paragraphs 208 through 211 as pertains to Remington. States that he is without information sufficient to form a belief as to the veracity of the averments of paragraphs 208 through 211 as pertains to other defendants. Notes that the false light tort does not apply to public figures such as the plaintiffs.

States that the enumerated paragraphs A – G, following paragraph 211, contain a request for relief as to which no response is required. To the extent a response is required, Remington denies plaintiffs are entitled to the requested relief or to any relief.

## COUNT 5 – TORTIOUS INTERFERENCE

### (AGAINST CAPONECCHIA, REMINGTON, GRANT, AND DOWNES)

212. Repeats and realleges his answers to the averments contained in paragraphs 1 through 211 as if fully set forth herein.

213. States that he is without information sufficient to form a belief as to the veracity of the averments of paragraph 213.

214-215. Denies the averments of paragraphs 214 through 215 as pertains to Remington. States that he is without information sufficient to form a belief as to the veracity of the averments of paragraphs 214 through 215 as pertains to other defendants.

216-222. States that he is without information sufficient to form a belief as to the veracity of the averments of paragraphs 216 through 222.

States that the enumerated paragraphs A – G, following paragraph 222, contain a request for relief as to which no response is required. To the extent a response is required, Remington denies plaintiffs are entitled to the requested relief or to any relief.

### GENERAL DENIAL

223. Remington denies each allegation in the Complaint that is not specifically admitted herein.

**GENERAL ALLEGATIONS IN SUPPORT OF AFFIRMATIVE DEFENSES**

FOR FURTHER ANSWER AND BY WAY OF AFFIRMATIVE DEFENSES, defendant Remington alleges as follows:

224.  "Stolen Valor" is an illegal act regarding the lying about, exaggeration of, or other misrepresentation of military service, awards, decorations and/or rank. It is an all-too-common occurrence among non-veterans and military veterans alike which many veterans like Remington take as a personal affront to their own military service. The Supreme Court has determined that claiming "stolen valor" is free speech unless used to receive tangible benefit such as (but not limited to) free meals, free tickets, or actual money.

225.  There is a group of military veterans who have banded together to detect, investigate and expose perpetrators of "stolen valor". This group operates the Facebook community page, "Stolen Valor" (https://www.facebook.com/StolenValor ). There is an associated webpage called "This Ain't Hell" (http://thisainthell.us/blog/ ) which assists in investigating and facilitates discussion among veterans and interested members of the public regarding possible cases of "stolen valor". A cursory review of either site demonstrates that "stolen valor" is just as likely to be committed by actual military veterans (including "disabled veterans") as by non-veterans.

226.  It is through an entry on the "This Ain't Hell" website that Remington first became aware of plaintiffs. This entry contains discussion by several veterans of what they view as unacceptable conduct by plaintiffs (see http://thisainthell.us/blog/?p=37377 ).

227.  Under information and belief, contrary to characterizations by the plaintiff, plaintiff's military service was unremarkable and undistinguished. He was never promoted based on merit but only on the basis of "Time-in-Grade/Time-in-Service" as is normal for low-ranking enlisted personnel.

228.    Under information and belief, by the plaintiff's own admission, he was only wounded in the first place because he harassed and intimidated a fellow airman in order to take his place at Balad Air Base.

229.    Under information and belief, there is no evidence publicly available to support plaintiff's claim that he is "the most seriously injured airman in United States history who survived." There is no credible methodology or mechanism existing to verify such absurd, unquantifiable and subjective claim. While plaintiff is in fact a "triple amputee", Mr. Clarence "Red" Mosley was an airman who served in the US Air Force during the Korean War and was so severely wounded that he lost both hands and legs, becoming a "quadruple amputee". Mr. Mosley was obviously more severely wounded than the plaintiff and he survived his wounds to live a full life until his death in 2011.

230.    Under information and belief, plaintiff has impersonated superior rank on at least one occasion.

231.    Under information and belief, contrary to the rules of military law, known as the Uniform Code of Military Justice (UCMJ), plaintiff also refuses to place an indicator of his retired status with his rank on his autonymous Facebook page.

232.    Under information and belief, contrary to the UCMJ, plaintiff also refuses to remove his picture, portraying himself in full dress uniform, from his autonymous Facebook page which is rife with extreme and incendiary political statements.

233.    Under information and belief, as part of his political activities, plaintiff has on more than one occasion publicly encouraged active duty servicemembers to commit mutiny and disobey lawful orders. This, by the very definition of the word, is sedition. It has also been noticed by members of the public at large that the plaintiff has portrayed the nature of his military service in a seemingly deceptive light.

234.    Under information and belief, plaintiff has lied about the nature of his military service, making claims that he was trained as a pilot but served as an "Army policeman".

14

235.   According to plaintiffs' own public statements, plaintiffs initiated a sexual relationship on their first date in early 2008. Plaintiff's first wife, Paige Kolfage, formerly a resident of AZ, petitioned for divorce in December, 2009. From these facts, Plaintiffs were engaged in an extramarital affair for almost 36 months prior to being divorced from his first wife, Paige, in 2011.

236.   As a recipient of a military pension, the medically retired plaintiff is still subject to the jurisdiction of the UCMJ. Adultery is a violation of the UCMJ.

237.   Under information and belief, even as recently as July 14, 2014, plaintiff has passed the creative work of another person as his own creation in a blatant act of plagiarism.

238.   Under information and belief, plaintiff operates under a definition of integrity differing from the generally accepted convention. By plaintiff's own admission, the Department of Veteran's Affairs (VA) has determined that the plaintiff illegitimately received over $4800 in benefits to which he was not entitled. Plaintiff has further alleged that the VA admitted to him that this was due to a clerical error. Plaintiff has not made any such admission by the VA publicly available and the VA is forbidden by law or regulation from commenting outside a court of law on such matters. Subsequent to the earlier admissions by the plaintiff, he has most recently claimed that the VA has increased that determination of unentitled benefits to $7000. This is hardly the result one would expect from correcting a "clerical error".

239.   Under information and belief, plaintiffs operate an alleged charity as an apparently unregistered business enterprise consisting solely of the two plaintiffs. The enterprise has not applied for 501(c)(3) status and as there appears to be no organization behind it, the enterprise does not appear to qualify for such status. Plaintiffs have refused to make a public accounting of expenditures and donations of the enterprise, contrary to normal practice for legitimate charities while also disqualifying it for 501(c)(3) status.

240. Under information and belief, the name of plaintiff's alleged charity is "Wounded Warrior Mentoring Engagements". This name is very similar, as to be almost identical, to a legitimate registered charity named "Wounded Warrior Mentoring Project". To the untrained eye, there is a great potential for "brand confusion". Such brand confusion could possibly lead to fewer donations to the legitimate, more established, older "Wounded Warrior Mentoring Project".

241. Under information and belief, plaintiff has alleged that he started the business enterprise as a solo venture, instead of joining with other more established charities, due to decreased funding from the VA for such ventures. This allegation by the plaintiff is uncorroborated by other entities of similarly stated purpose as the plaintiff's business venture, such as the Wounded Warrior Mentoring Project.

242. Under information and belief, the activities conducted by the plaintiff as part of his business venture appear to be primarily public speaking, "whirlwind tours" of overseas locations and other such public appearances. Mentoring traditionally involves long-term one-on-one relationships. With plaintiff's schedule of classes, homework, and public appearances there does not appear to be any mentoring having occurred. As "Mentoring" is included in the name of the enterprise, this could be construed as a deceptive trade practice.

243. Under information and belief, additional administrators for plaintiff's autonymous Facebook page listed in the complaint include the plaintiff's father, Brian G. Kolfage, Sr., of MI, who also has his own autonymous Facebook page.

244. Under information and belief, in addition to the autonymous Facebook page listed above, plaintiff is also administrator of the currently defunct "Team Kolfage Against Bullying" page. Through this page, numerous harassing and/or defaming posts aimed at Remington (as well as other defendants) were made, in an attempt to get him fired from his job.

245. Under information and belief, plaintiff's attitude toward people of different religious beliefs, other than his own, is one of contempt and derision.

246. Under information and belief, plaintiff has used his Twitter account to harass, intimidate and/or defame individuals he disagrees with. This includes the whole-cloth fabrication of fake posts which he attributes to such individuals.

247. Under information and belief, plaintiff's autonymously named Facebook page and Twitter account have both been suspended at least once for violations of providers' standards of proper conduct.

248. Under information and belief, plaintiff was involved in the operation of at least one fake Facebook profile impersonating Caponecchia. Such profile was used to attack Remington, threatening to kill Remington's infant daughter, Alana, posting "Such a cute baby. I wonder how she'd look in a tiny casket" in reference to a picture of Alana posted on Remington's pseudonymous Facebook profile.

249. On Feb 12, 2014, Remington's domestic partner, Susanne Gann (Gann), and Remington became aware of a fake Facebook page which was set up to harass them both and a corresponding false profile page impersonating Remington. The contents of these two pages were clearly intended to harass Remington and Gann - publishing private photos and personal information along with inflammatory and false accusations. Among the items harassing Gann was a screen capture of part of a background check on her, making a false accusation of criminal wrongdoing on Gann's part. Gann's full legal name was made public, though it had not previously been publicly available through her pseudonymous Facebook page. Remington and Gann's home address was also posted along with a map to their home. Pictures of their infant daughter, Alana, were included in a collage with Gann's image in an erotic pose with images of goats superimposed to imply bestiality and child abuse.

250.  Gann noticed that one of the pictures posted was a screenshot made by someone using her Facebook account. This confirmed a threatening message ("PM") sent to Remington on Jan 24, 2014, from a "fake" Facebook profile which had impersonated Caponecchia's mother, Margret Caponecchia, and has been alleged to be used by plaintiff's father, Kolfage, Sr., of MI.

251.  A screen capture of an excerpt of that "Private Message" ("PM") conversation (referred to in paragraph 250) was posted to the plaintiff's autonymous Facebook page, indicating he had direct access to the account which admitted hacking Gann's Facebook profile and supporting the conclusion that the Kolfage family was using that account to harass and attack Remington and other Facebook users, including Caponecchia.

252.  Under information and belief, both Brian Kolfage, Sr., and plaintiff have confirmed themselves to be administrators of the plaintiff's autonymous Facebook page.

253.  The private and personal information which was acquired illegally through Gann's "hacked" Facebook account, was misused by plaintiff on his autonymous Twitter page, along with posting false accusations of "leaking" sensitive information, blatantly harassing Remington in a malicious attempt to get Remington fired from his job at FedEx, and violating Remington's copyright to said image. Plaintiffs have offered no plausible explanation outside of illegally accessing Gann's "hacked" account on how they made the connection of Remington's pseudonymous Facebook page to Remington's legal name.

254.  Under information and belief, plaintiff's father, Kolfage Sr., also harassed and defamed Remington, in further attempts to get Remington fired, through various incendiary posts to the currently unpublished Facebook page titled "Team Kolfage Against Bullying" (TKAB). Plaintiff has admitted to controlling the TKAB page.

255.  On Mar 6, 2014, Remington was informed that plaintiff Ashley was using/controlling the fake "Darren Remington" profile. The same fake profile was used to contact

1    Remington's family in Florida, through Facebook on February 14, 2014. This was

2    clearly intended to harass Remington through other members of his family. In April,

3    Remington was informed by Jori Remington that her gmail account had been

4    compromised, or "hacked", by someone in AZ. Both plaintiffs in this action currently

5    are residents of AZ.

6   256.   Subsequent to the removal of the first fake profile and attack page, at least a half-dozen

7    fake profiles and harassing pages have been created and subsequently removed by

8    Facebook, as they have been discovered, for violating Facebook's standards of proper

9    conduct. These accounts have been used to post the same harassing material as

10   published on the original fake profile and harassing page and which had been misused

11   by the plaintiff.

12  257.   The most recent harassing page to be removed for violating Facebook standards of

13   conduct was a page named "Big Juan". The page was removed in April, 2014. The

14   "cover photo" for the page featured only eight individuals to include all seven named

15   defendants in this complaint plus Gann. "Big Juan" was also the name of a Mexican

16   restaurant chain with two locations in Tucson, AZ, where plaintiffs reside. The chain

17   was opened in March, 2012, and announced its closure in January, 2013. Shortly before

18   being removed, the page was renamed "Big Juan Prager" and more pictures were

19   posted of defendant Prager's family, as culled from Facebook, Myspace, and other

20   Internet sources. This clear violation of Prager's copyright was another thinly veiled

21   attempt of harassment, intimidation and coercion.

22  258.   Remington subsequently discovered an account on the career networking site,

23   LinkedIn, using Remington's name and listing their location as Hawaii, where plaintiff

24   is known to have resided with his mother. The account was created on or about the date

25   that Remington was alerted to the first imposter Facebook profile in February.

26

259. Under information and belief, Gann and Remington are not the only victims of plaintiff's harassment. Other victims include (but are not limited to) Jan Vrotsos, Bryan Andrew Klaves, Kristi Shields, and Mike A Duncan.

260. Under information and belief, regarding Jan Vrotsos, plaintiff posted fabricated screen captures, claiming them to be legitimate screen captures of statements by Ms. Vrotsos. Plaintiff claimed that the screen shots had been confirmed to be legitimate by various law enforcement agencies. It was later revealed that the screen shots had never even been examined by law enforcement agencies on behalf of plaintiff. As a result of plaintiff's posting Ms. Vrotsos' home address and phone number to his autonymous Facebook page, Ms. Vrotsos and her elderly mother received hundreds of phone calls and email messages threatening both of them (and their dog) with death.

261. Under information and belief, regarding Bryan Andrew Klaves, plaintiff claimed that Mr. Klaves had "attacked" him online, and proceeded to foment a vigilante mindset among to get Mr. Klaves fired from his job with the VA.

262. Under information and belief, regarding Kristi Shields, plaintiff presented fabricated screen captures, claiming them to be legitimate screen captures of statements by Ms. Shields, and fomenting a vigilante mindset among his many thousands of internet followers to create a situation similar to what happened with Ms. Vrotsos and Mr. Klaves. Plaintiff urged his followers to "Make her famous" which was obviously a thinly veiled threat of harassment and intimidation.

263. Under information and belief, regarding Mike A Duncan, while making a public call to victimize Mr. Duncan in similar manner as Ms. Vrotsos, Mr. Klaves and Ms. Shields, plaintiff proudly claimed that he believes in "street justice". It should be noted that Mr. Duncan is a 20-year veteran of the USAF, retiring with the rank of Technical Sergeant, a rank superior to that of either Remington or plaintiff, and had no previous interaction with plaintiffs. The critical Facebook posts that plaintiff took offense to were made by

1      Tami Duncan, Mr. Duncan's spouse, using her own autonymous Facebook profile.

2  264.  Under information and belief, plaintiff has confirmed his involvement in such domestic

3      terrorism as described in paragraphs 260 to 263. The plaintiff has stated, "... they said

4      mean stuff, so I exposed them and all their info." By these actions, plaintiff has

5      demonstrated that he has no compunction about recklessly disregarding the law to seek

6      revenge for perceived wrongs, no matter how slight. People who are not mentally

7      disturbed would go to the police, or report such offensive material to the site

8      administrators where the content is found; actions that plaintiffs failed to take because

9      the critical posts that the defendants have taken offense to are neither criminal nor

10      inappropriate.

11  265.  Under information and belief, plaintiff's online behavior, through his autonymous

12      Facebook and Twitter pages, and other Facebook pages demonstrate a pattern of serial

13      harassment and intimidation.

14  266.  Remington's involvement with plaintiff began on or about January 10, 2014, when he

15      encountered a posted entry on the "This Ain't Hell" website (see

16      http://thisainthell.us/blog/?p=37377 ) outlining plaintiff's calls for mutiny among active

17      duty servicemembers.

18  267.  Through that blog entry, Remington found plaintiff's autonymous Facebook page and

19      commented on one of the more blatantly deceptive and untrue memes posted by the

20      plaintiff. Plaintiff proceeded to promptly ban Remington from his autonymous

21      Facebook page. That meme, along with all accompanying comments, has since been

22      removed from public view.

23  268.  The "Urban Dictionary" defines a meme as "a pervasive thought or thought pattern that

24      replicates itself via cultural means"

25      (source: http://www.urbandictionary.com/define.php?term=meme ). On Facebook, it is

26      common to express such ideas using a picture with a short textual quote or caption

21

1    overlayed or otherwise incorporated into the picture, similar to political cartoons

2    printed in newspapers. This is referred to by Facebook users as a "meme".

3    269.   Referred by an entry on the "Stolen Valor" Facebook page, Remington then

4    encountered one of Caponecchia's pages and viewed the harassment and bullying that

5    Caponecchia had been subjected to by plaintiff's father, Kolfage, Sr., plaintiff Ashley's

6    father, Art Goetz, and an anonymous email account ("snomad700@yahoo.com") on

7    behalf of, and of benefit to, plaintiffs.

8    270.   On Jan 10, 2014, Remington sent an email to "snomad700" to deliver a message to

9    Brian Kolfage, Sr, and Art Goetz, suggesting that they immediately cease the

10   harassment and bullying of Caponecchia. The IP address of the response from

11   "snomad700" indicates that it was sent from somewhere near Dearborn, MI, where

12   Kolfage, Sr., is known to reside. An "IP Address" is a unique identifier of a computer

13   connected to a computer network, such as the Internet.

14   271.   The harassment of Gann started on February 12, 2014, when the first fake pages,

15   impersonating Remington, were published on Facebook. Gann has had no direct

16   interaction with plaintiffs and such harassment was clearly intended to silence and

17   intimidate Remington by harassing and embarrassing his close friends and family

18   members. The harassment of Gann includes the public posting of her home address,

19   with a map showing the location; the public posting of personal telephone numbers; the

20   public posting of other personal, sensitive information. The information was posted in

21   such manner as to maliciously and wrongfully imply that Gann was involved in

22   criminal activities.

23   272.   Under information and belief, the three principle people involved in the illegal

24   "hacking" of Gann's Facebook account and subsequent harassment of Gann and

25   Remington are: Plaintiff Kolfage, plaintiff Ashley, plaintiff's father, Kolfage, Sr.

26

273.   Under information and belief, plaintiff has frequently posted public statements of a political nature that clearly identify him as aligned with the extreme right wing of the political spectrum in the United States. Attorney Elia has also posted information publicly that indicates he is aligned with and of the same extreme political beliefs as the plaintiff.

274.   Under information and belief, plaintiff's family and followers have been encouraging plaintiff to pursue a political career, even the Office of the President of the United States. The negative, yet accurate, information which the plaintiff wishes to have removed from the internet by this Complaint would preclude the furtherance of such political aspirations.

275.   By and through plaintiffs' baseless complaint, attorneys Elia and Ingle are furthering the campaign of harassment and defamation against Remington. As licensed attorneys, Elia and Ingle know, or should know, that a "False Light" tort applies to private non-public individuals, such as Remington, and not public figures such as the plaintiffs. The lifestyle and daily activities of the plaintiffs, as described by the plaintiffs in this very Complaint, as well as published interviews, are clearly that of public figures.

276.   Elia has composed and filed this Complaint as part of the campaign to harass, defame and intimidate Remington, while aiding and assisting Kolfage Jr. in rehabilitating his online image. He has clearly lied to the media about the nature of the lawsuit as he stated in an interview with the media on June 06, 2014, that his intent was to get the "harassment" and "lies" about plaintiffs to stop. Elia did not send any "cease and desist" letters to Remington, as would be customary if his intent truly were to simply stop what plaintiffs have portrayed as harassment.

277.   There may be others involved that Remington is currently unaware of and who will be named as further information is made available through the discovery process for this action.

278. The information and averments contained in paragraphs 249 to 272 have been included in Criminal Complaint 14-0598213, filed by Remington and Gann with the local Police Department in TN, naming the plaintiffs and plaintiff's father, Kolfage, Sr., as principle suspects. The criminal complaint outlines how Susanne Gann's (Gann) Facebook account was "hacked" (a federal crime, as well as a crime in the states of TN and AZ) and that illegal access led to the disclosure of Remington's full, legal name which was not accessible or available from Remington's pseudonymous Facebook account. The illegal access also led to the disclosure of Gann's full, legal name which was not otherwise accessible or available to the public through Gann's pseudonymous Facebook account. The plaintiffs have yet to explain with any plausibility how they made the connection between Remington's legal identity and his pseudonymous Facebook profile, or how they made the connection between Gann's legal identity and her pseudonymous Facebook profile. The fact that they made use of private, personal information that was not otherwise available is unconscionable and offensive.

279. That attorneys Elia and Ingle have facilitated the persistent campaign of harassment and defamation by and through this Complaint is unacceptable for any officer of the court. It is especially troubling that these attorneys have utterly failed to do their due diligence before presenting this Complaint to this Court. That they intend to try this case in the media instead of this Court is evident by the dozens of Internet articles referencing this case (posted even before all defendants have been served) such as found at

a.) http://www.roselawgroup.com/rlgers/rose-law-group-litigation-cyber-law-attorney-logan-elia-tells-fox-10-suit-facebook-bullies-video.html ,

b.) http://www.roselawgroup.com/rlgers/disabled-vet-ua-student-sues-facebook-posters-smear-campaign-represented-rose-law-group-cyber-law-attorney-logan-elia.html ,

c.) http://tucson.com/news/local/veteran-s-social-media-suit-seeks-to-define-libel/article_cff9648a-7e1d-5580-81b2-8b09cc1a6f95.html ,

d.) http://www.military.com/daily-news/2014/07/08/air-force-vet-in-social-media-lawsuit.html?comp=1199436026997&rank=1 ,

e.) The media coverage has reached as far east as Boston:
http://www.myfoxboston.com/story/25971722/2014/07/08/valley-military-vet-files-lawsuit-against-online-bullies

280. Plaintiffs are also attempting to try this case in the media from his newly relaunched political website http://www.woundedamericanwarrior.com/triple-amputee-war-veteran-brian-kolfage-law-suit-filed/ . Such activities by attorneys and plaintiffs will make any fair hearing for the defendants impossible as attorneys and plaintiffs have severely poisoned any potential jury pool.

281. To be clear, the local media in Arizona was provided with an electronic copy of the complaint (sans any complaint number) before the first defendant had been served, even before the complaint had been filed with the Court.

282. Remington maintains no contacts, business or personal, with anyone in the State of Arizona. Remington owns no property within the State of Arizona, real or otherwise. Remington has never visited the State of Arizona, even while in transit to locations outside the State of Arizona.

283. In way of an Internet "presence", Remington maintains a personal, pseudonymous Facebook profile (https://www.facebook.com/Ren.Rem84/ ) and a similarly named personal, pseudonymous Facebook page (https://www.facebook.com/Ren.Rem.Vet ). Both of these pages are for personal, non-commercial use and, as they are *a very small part* of the whole Facebook website, do not qualify as websites, *per se.*

## AFFIRMATIVE DEFENSES

### First Defense

1    Plaintiffs' claims regarding "Count 1", more appropriately titled "First Cause
2    of Action" as this is not a criminal indictment, are barred by the doctrine of Unclean
3    Hands. Additionally, the plaintiffs are considered "public figures" as evidenced by the
4    plaintiffs' own allegations regarding their lifestyle and conduct of daily affairs,
5    therefore the claims regarding the First Cause of Action are barred as the plaintiff's
6    second and third averments in paragraph 103 show lack of evidence of actual malice.
7    Additionally, the plaintiffs' own public statements confirm the veracity of any and all
8    statements by Remington regarding plaintiffs, further disqualifying plaintiffs' claims
9    under First Cause of Action. As public figures, the plaintiffs are further required to
10   demonstrate actual harm by Remington's allegedly false statements, which they have
11   utterly failed to do. They have not demonstrated, nor can they demonstrate, any
12   negligence regarding the truth by Remington. They have not demonstrated, nor can
13   they demonstrate, any actual malice by Remington. Plaintiff's claims regarding the
14   First Cause are further barred because Remington's statements regarding Plaintiffs
15   were made in the exercise of an absolute right, proper and/or justified, being neither
16   false nor outrageous.

17                          **Second Defense**

18   Plaintiffs' "Count 2", more appropriately titled "Second Cause of Action" as
19   this is not a criminal indictment, fails to state a claim against defendants upon which
20   relief can be granted.

21                          **Third Defense**

22   Plaintiffs' claims regarding "Count 3", more appropriately titled "Third Cause
23   of Action" as this is not a criminal indictment, are barred by the doctrine of Unclean
24   Hands. Plaintiffs' claims regarding the Third Cause are further barred because
25   Remington has not engaged in any unlawful or unfair behavior, and Remington's
26

conduct was performed in the exercise of an absolute right, proper and/or justified, being neither extreme nor outrageous.

### Fourth Defense

Plaintiff's claims regarding "Count 4", more appropriately titled "Fourth Cause of Action" as this is not a criminal indictment, are barred by the doctrine of Unclean Hands. Plaintiff's claims regarding the Fourth Cause are further barred because Remington has not engaged in any unlawful or unfair behavior, and Remington's conduct was performed in the exercise of an absolute right, proper and/or justified, being neither extreme nor outrageous. Plaintiffs' claims regarding the Fourth Cause are further barred because the plaintiffs are public figures. A False Light tort is applicable only to private non-public individuals, since it involves elements of privacy that plaintiffs voluntarily surrendered in making themselves public figures.

### Fifth Defense

Plaintiffs' claims regarding "Count 5", more appropriately titled "Fifth Cause of Action" as this is not a criminal indictment, are barred by the doctrine of Unclean Hands. Simply having *ex parte* contact with one party of a non-existent contract does not constitute interference in the performance of a contract. Plaintiff's claims regarding the Fifth Cause are further barred because Remington has not engaged in any unlawful or unfair behavior, and Remington's conduct was performed in the exercise of an absolute right, proper and/or justified, being neither extreme nor outrageous.

### Sixth Defense

Plaintiff's Complaint constitutes being a nuisance/frivolous lawsuit, qualifying as an Abuse of Process, a Malicious Prosecution, and a Specious Prosecution. Plaintiff's claims *in toto* are baseless and without merit because Remington has not engaged in any unlawful or unfair behavior, and Remington's conduct was performed

1  in the exercise of an absolute right, proper and/or justified, being neither extreme nor
2  outrageous.

### Seventh Defense

4      Plaintiff's claims *in toto* are barred as some or all of the allegations alleged
5  above may be entitled to a qualified privilege.

### Eighth Defense

7      Plaintiff's claims *in toto* are improperly venued in this district as plaintiffs are
8  residents of Pima County, AZ. The Complaint has been filed in Maricopa County as a
9  result of attorney Elia's "venue shopping".

### Ninth Defense

11      Plaintiffs have failed to serve process upon this defendant in the manner and
12  form required by law. Attorney Elia sent the Summons for this Complaint by certified
13  mail to a former address in Florida where Remington has not resided in over seven
14  years, knowing full well his current address is in Tennessee, as registered with the
15  U.S. Postal Service. Attorney Elia also sent the Summons for this Complaint by
16  process server to the address of an elderly woman in FL – an address that Remington
17  has never resided at nor knowingly received mail at. This is clearly a blatant act of
18  harassment and intimidation of Remington's extended family. Attorney Elia has also
19  mis-used process of service for this complaint to interfere with Remington's
20  relationship with his current employer, whose headquarters is in Atlanta, GA – a city
21  where Remington has never lived nor received mail at. As Elia should have known
22  Remington's current address is in Tennessee, as registered with the U.S. Postal
23  Service, this is clearly an instance of Tortious Interference of a Business Relationship
24  on the part of Elia. Remington only learned of this Complaint (and being named as
25  defendant) via third party report in the media.

26

**Tenth Defense**

**Remington is not subject to personal jurisdiction in the State of Arizona**

In opposition to a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper. *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). Here, plaintiff cannot "simply rest on the bare allegations of its complaint," but rather must "come forward with facts, by affidavit or otherwise, supporting personal jurisdiction." *Amba Marketing Systems, Inc. v. Jobar Intern.*, 551 F.2d 784, 787 (9th Cir. 1977).

A court may exercise personal jurisdiction over a non-resident defendant consistent with due process only if he or she has "certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (internal quotations omitted). There are two forms of personal jurisdiction that a forum state may exercise over a non-resident defendant – general jurisdiction and personal jurisdiction. For the reasons stated below, Remington is subject to neither.

1. The Court lacks general jurisdiction because Remington's contacts with Arizona do not "approximate physical presence". General jurisdiction exists where the business contacts with the forum state are so substantial, continuous and systematic that they "approximate physical presence." *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000). The types of contacts with a forum state determined by courts to confirm general jurisdiction include, ownership of property, the maintenance of bank accounts, having employees, soliciting business, or having a designated agent in the state. *See Glencore Grain v. Shivnath Rai Harnarain*, 284 F.3d 1114, 1124-25 (9th Cir. 2002). Conversely, "engaging in commerce with residents of

the forum state is not in and of itself the kind of activity that approximates physical presence within the state's borders." *Bancroft & Masters, Inc.*, 223 F.3d at 1086.

Remington's contacts with Arizona do not approximate those necessary to confer general jurisdiction. Like the defendant in *Glencore Grain*, who the court found lacked the necessary contacts to support general jurisdiction, Remington does not own property, maintain bank accounts, have employees, solicit business, or have a designated agent in the state of Arizona. The only contacts that the defendant in *Glencore Grain* had with California were the employment of an independent sales agent to distribute the defendants' products, and fifteen shipments into San Francisco. Here, Remington has significantly less contacts than the defendant in *Glencore Grain*. Any contacts in this case are the result of isolated electronic communication with plaintiffs, the location of which resides on servers that are entirely out of Remington's control. As in *Glencore Grain*, general jurisdiction is improper.

2. The Court lacks personal jurisdiction as there is a lack of "minimum contacts" as established by the U.S. Supreme Court in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) pp. 291–292: "As has long been settled, and as we reaffirm today, a state court may exercise personal jurisdiction over a nonresident defendant only so long as there exist minimum contacts between the defendant and the forum State.... The concept of minimum contacts, in turn, can be seen to perform two related, but distinguishable, functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system" (internal quotations omitted.)

Under the current doctrine, a state court may only exert personal jurisdiction over an individual or entity with "sufficient minimal contacts" with the forum state such that the particular suit "does not offend 'traditional notions of fair play and justice.'"

*International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945). The "minimum contacts" must be purposefully directed towards the state by the defendant *International Shoe Co. v. Washington,* 326 U.S. 310, 319 (1945).

When an individual, or entity, has no "minimum contacts" with a forum State, the Due Process Clause of the Fourteenth Amendment prohibits that State from acting against that individual, or entity. The lack of "minimum contacts" with the owner of property also constitutionally prohibits action against that property (*in rem* jurisdiction) even when the property is located within the forum state. *Shaffer v. Heitner*, 433 U.S. 186, 212 (1977).

What constitutes sufficient "minimum contacts" has been delineated in numerous cases which followed the International Shoe decision. For example, in *Hanson v. Denckla*, the Court proclaimed the "unilateral activity of those who claim some relationship with a nonresident cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the nature and quality of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege or conducting activities within the forum State, thus invoking the benefits and protection of its laws." *Hanson v. Denckla*, 357 U.S. 235 (1958).

The additional requirement of "'purposeful availment' ensures that a defendant will not be hauled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, [citations omitted] or of the unilateral activity of another party or a third person [citation omitted]." *Burger King v. Rudzewicz.*471 U.S. 462, 475 (1985). Jurisdiction may, however, be exercised, under some circumstances, even though the defendant never physically entered the forum State. *Quill v. Heitkamp*, 504 U.S. 298 (1992).

1      The United States Supreme Court has decided a number of cases that have

2  established and refined the principle that it is unfair for a court to assert jurisdiction

3  over a party unless that party's contacts with the state in which that court sits are such

4  that the party "could reasonably expect to be haled into court" in that state. This

5  jurisdiction must "not offend traditional notions of fair play and substantial justice".

6  *International Shoe Co. v. Washington*, 326 U.S. 310 (1945). A non-resident defendant

7  has minimum contacts with the forum state if they 1) have direct contact with the state;

8  2) have a contract with a resident of the state; *McGee v. International Life Insurance*

9  *Co.*, 355 U.S. 220 (1957) 3) have placed their product into the stream of commerce

10  such that it reaches the forum state; *Gray v. American Radiator & Standard Sanitary*

11  *Corp.*, N.E.2d 176: 761 (1961) 4) seek to provide a service to residents of the forum

12  state; *World-Wide Volkswagen Corp. v. Woodson*, 222 U.S. 286 (1980) 5) have a non-

13  passive website viewed within the forum state; or 6) have satisfied the Calder effects

14  test. *Calder v. Jones*, 465 U.S. 783 (1984).

15      Courts have struggled with the Internet as a source of minimum contacts.

16  Although not determinately established by the Supreme Court, many courts use

17  the *Zippo* test, *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119

18  (W.D. Pa. 1997), which examines the kind of use to which a defendant's website is

19  being put. Under this test, websites are divided into three categories:

20  *1. passive* websites, which merely provide information, will almost never provide

21      sufficient contacts for jurisdiction. Such a website will only provide a basis for

22      jurisdiction if the website itself constitutes an intentional tort such as slander or

23      defamation, *and* if it is directed at the jurisdiction in question;

24  *2. interactive* websites, which permit the exchange of information between website

25      owner and visitors, *may* be enough for jurisdiction, depending on the website's level

26

1   of interactivity and commerciality, and the amount of contacts which the website

2   owner has developed with the forum due to the presence of the website;

3   3.  *commercial* websites which clearly do a substantial volume of business over the

4   Internet, and through which customers in any location can immediately engage in

5   business with the website owner, definitely provide a basis for jurisdiction.

6   As declared in the Allegations in Support of Affirmative Defenses, Remington

7   has not had any direct contact with the state of Arizona. Remington does not have any

8   contracts with any resident of the state of Arizona. Remington does not offer any

9   product at all, much less one that has been placed into the stream of commerce of the

10  state of Arizona. As a private, non-public individual residing in the state of Tennessee,

11  Remington has not sought, nor currently seeks, to provide any services to the residents

12  of Arizona. Thus, tests 1 through 4 above, for establishing "minimum contacts", fail on

13  their face.

14  Remington does not maintain or operate any website, passive or otherwise.

15  Remington's Facebook presence is maintained as a *very small part of* the whole

16  Facebook website, which is operated by the Facebook Corporation, based in California

17  and outside of Remington's control. Said Facebook presence in and of itself does not

18  qualify as a website *per se*. To claim that maintaining a Facebook presence is

19  equivalent to operating a website is tantamount to claiming that renting a Post Office

20  Box is equivalent to being a postal carrier or that owning shares of stock is equivalent

21  to being a stock broker. Therefore, plaintiffs' Complaint fails the *Zippo Test* (#5 above)

22  for establishing "minimum contacts".

23  Telling the truth does not constitute a tortious act, no matter how unflattering or

24  what consequence may or may not occur. In opposing this Motion to Dismiss for Lack

25  of Personal Jurisdiction, it is incumbent upon the plaintiffs to demonstrate, and not

26  merely state, that Remington's actions were indeed tortious. *Amba Marketing Systems,*

33

1   *Inc. v. Jobar Intern.*, 551 F.2d 784, 787 (9th Cir. 1977). Without such demonstration,

2   the Complaint fails to meet the standard of the Calder Effects test as the Calder Effects

3   test pertains to wrongful and tortious acts. As Remington did not act wrongfully or

4   outside of any absolute right, the Complaint fails to meet the Calder Effects test and

5   subsequently personal jurisdiction is improper.

6

7                                      **CONCLUSION**

8          In summary, plaintiffs are attempting to pervert the course of justice in order to

9   further their campaign of harassment, defamation and intimidation of Remington; to

10  "whitewash" the history of plaintiffs' behavior both online and offline; and avoid the

11  usual consequences of such unacceptable and abhorrent behavior as that exhibited by

12  the plaintiffs.

13         FOR FURTHER ANSWER AND BY WAY OF RESERVATION OF RIGHTS,

14  Remington specifically reserves his right to amend his answer and add additional

15  claims or defenses as discovery proceeds and further information becomes available.

16

17         WHEREFORE, defendant Remington respectfully requests judgment dismissing

18  the Complaint with prejudice and further requests that the Court award Remington

19  reasonable attorney's fees and expenses and the costs and disbursements of defending

20  this action pursuant to A.R.S. § 12-349, along with such other and further relief as the

21  Court deems just and proper.

22         RESPECTFULLY SUBMITTED this 13th day of August, 2014.

23

24                                              /s/Darren Remington

25                                              Darren Remington

26                                              Defendant

                                              34